UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION

| | |
|---|---|
| TIFFANY BECKMAN, )<br>as the personal representative of )<br>the estate of Mitchell Campbell, )<br>)<br>    Plaintiff, )<br>v. )<br>)<br>JOE HAMILTON, )<br>)<br>    Defendant. ) | Civil Action Number<br>  3:15-cv-01277-AKK |

## MEMORANDUM OPINION

Tiffany Beckman, as the personal representative of the estate of Mitchell Campbell, brings this action against Lauderdale County Deputy Sheriff Joe Hamilton in his individual capacity, alleging a violation of Campbell's Fourth and Fourteenth Amendment rights for the alleged use of excessive force, pursuant to 42 U.S.C. § 1983. *See generally* doc. 1. The court has for consideration Deputy Hamilton's motion for summary judgment, doc. 27, which is fully briefed, docs. 28; 35; 38, and ripe for review. For the reasons stated more fully below, in particular, all the circumstances relevant to Deputy Hamilton's use of force and because "it is reasonable, and therefore constitutionally permissible, for an officer to use deadly force when he has 'probable cause to believe that his own life is in

1

peril,'" *see Singletary v. Vargas*, 804 F.3d 1174, 1181 (11th Cir. 2015), the motion is due to be granted.

## I. STANDARD OF REVIEW

Under Fed. R. Civ. P. 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." To support a summary judgment motion, the parties must cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c). Moreover, "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id*. at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id*. at 324 (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual disputes will be resolved in the non-moving party's favor when sufficient competent evidence supports the non-moving party's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)). Furthermore, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II. FACTUAL BACKGROUND

On the evening of August 10, 2013, a dispute erupted between Mitchell Campbell and his neighbors — Andrea Whitaker, Hannah Whitaker, and Justin Whitaker ("the Whitakers"). Docs. 29-8; 29-9; 29-10; *see also* doc. 29-6 at 12

(Beckman, Campbell's common law wife, stating, "I could hear yelling"). Apparently, the dispute began with Campbell drinking whiskey and shooting his gun against a "deer head" target Campbell had set up on his boat, located in his front yard to the right of his porch and facing away from the Whitakers' house. Doc. 29-6 at 9–12. At some point, Campbell allegedly drove his car to the Whitakers. *See* docs. 29-8 at 3–4; 29-9 at 3; 29-10 at 3. According to the Whitakers, Campbell was drunk, and had a gun and a knife. Docs. 29-8 at 3; 29-9 at 3; 29-10 at 3. Somehow, Campbell "threw" his keys and the Whitakers helped him find them. Docs. 29-8 at 3; 29-10 at 3. When Andrea Whitaker's boyfriend confronted Campbell "about driving in his state of intoxication," doc. 29-8 at 3, Campbell allegedly "became combative and began cursing," stating, "You don't have to drive on the fucking road then. I will do what I want. This isn't your fucking driveway." Docs. 29-8 at 3–4; 29-10 at 3.

Campbell then sped back to his property. Docs. 29-8 at 3–4; 29-10 at 3. Once Campbell returned to his mobile home, he began shouting threats at the Whitakers and shooting at their residence. *See* docs. 29-8 at 4 ("About five minutes later, we heard Campbell screaming and cursing at us from his porch. He then began firing a rifle . . . . He fired numerous shots in our direction . . . I heard Campbell yell, "I'm going to fucking kill all of you!"); 29-10 at 3 ("About five minutes later, we heard Campbell screaming and cursing at us from his porch. He

4

yelled, 'You faggot motherfuckers! I'm going to kill you!' He then began firing a rifle . . . . He fired numerous shots in our direction."). At 8:57 p.m., Andrea Whitaker called 911, *see* docs. 29-9 at 3–4; 29-22 at 08.57.56.0p, and reported that Campbell was yelling and screaming, actively shooting a rifle at her residence, and verbally threating to kill her family. Docs. 29-1 at 17–18; 29-22 at 08.57.56.0p, 08.59.22.3p, 09.01.35.1p, 09.03.31.6p, 09.04.33.1p, 09.04.57.8p, 09.09.19.7p.

The dispatcher who received the call relayed to the Sheriff's deputies that Campbell was "very intoxicated,"[1] owned "several guns," and was actively shooting a gun at the Whitakers' residence — one bullet already purportedly having hit the Whitakers' home[2] — from his front yard and yelling threats that he was "coming to [the Whitakers'] residence and going to kill them." Docs. 29-4 at 7; 29-6 at 22; 29-8 at 4; 29-9 at 2–4; 29-10 at 2–5; 29-22 at 08.59.22.3p, 09.01.35.1p, 09.04.57.8p, 09.09.19.7p. Deputy Hamilton, the first of the four officers who responded, heard a shot from Campbell's property travel through the trees and leaves near the Whitakers' house. Docs. 29-1 at 8, 11; 29-3 at 10; 34-5; 34-6; 34-7; 34-8. Based on this and other shots, Deputy Hamilton confirmed the

---

[1] At the time of death, Campbell's blood alcohol level was at .335 grams per 100 milliliters. Docs. 29-5 at 26; 29-6 at 18; 29-10 at 8. Hydrocodone and marijuana were also found in Campbell's system. Docs. 29-5 at 27; 29-6 at 6, 18; 29-20 at 8.

[2] While hiding in their home, the Whitakers heard a shot hit their residence. Docs. 29-8 at 4; 29-9 at 4. During an examination of the Whitakers' property following the incident, "[a]gents found a hole under one of the bedroom windows that may have been caused by a bullet," but no bullet was found. Doc. 34-23 at 1.

5

accuracy of the Whitakers' reports to the dispatcher. Doc. 29-1 at 13. Also, two men hiding behind vehicles warned the four responding officers to take cover to avoid being shot by Campbell. *See* doc. 29-1 at 23 (Deputy Hamilton explained, "two male subjects . . . [were] hiding behind the vehicles and told us to take cover or we'd get shot"); *see also* doc. 29-10 at 2–5.

The Whitakers relayed the evening's events to the deputies, including that Campbell had threatened to kill them and "had been shooting at their residence." Doc. 29-2 at 5; *see also* docs. 29-8 at 4; 29-9 at 4; 29-10 at 4. While talking to the Whitakers, the deputies heard sporadic shots fired through the trees nearby that "sounded like bullets whizzing through the trees," and Campbell yelling and cursing. *See* docs. 29-1 at 13; 29-2 at 4–5; 29-4 at 3.

Deputy Hamilton, as the ranking officer, led the deputies "under the cover of darkness" to Campbell's residence. Docs. 29-1 at 14–16; 19; 29-2 at 16; 29-4 at 3, 6. For their own safety, the deputies purposefully kept themselves hidden from view as they approached Campbell's home and took a path that caused them to lose sight of Campbell "at times." Docs. 29-1 at 19; 29-2 at 6, 9. The deputies hoped to get close enough to Campbell to identify themselves as law enforcement before confronting and arresting him. As they neared the halfway point, Campbell — standing near the railing on his front porch, illuminated by porch light, holding a rifle, and intermittently "yell[ing] and scream[ing]" terms like "MF-ers, I'll kill

you," — fired "eight or ten" successive shots with his rifle in the direction of the Whitakers' house. Docs. 29-1 at 22–24; 29-2 at 5, 7–8, 10; 29-6 at 14. The officers "hit the field [in response] and went up the weeds and briars and everything, chiggers, rats and snakes." Doc. 29-4 at 3; *see also* doc. 29-4 at 5, 8. In Deputy Hamilton's opinion, Campbell "[a]ppeared to be belligerent." Doc. 29-1 at 23. Campbell was also listening to loud music playing from a vehicle in his front yard. Docs. 29-2 at 8; 29-3 at 4.

Before the officers reached Campbell's mobile home, Beckman brought Campbell his .22 caliber rifle to replace the shotgun and the .270 caliber gun Campbell had used up until that point. Doc. 29-6 at 12, 14. During the exchange, although Campbell was drinking whiskey, Beckman observed that Campbell was not slurring his speech or walking with the unsteady gait of an intoxicated person. *Id.* at 12.

Once the officers made it up Campbell's driveway and along the side of his home, Deputy Hamilton observed Campbell positioned outside the gate to his porch, toward the top of the steps, and standing without a firearm. Docs. 29-1 at 19–20, 27–28; 29-2 at 15. As a result, Deputies Hamilton and Brown stepped around the left side of the house, making themselves visible to Campbell. Docs. 29-1 at 19; 29-2 at 14; 29-3 at 5; 29-4 at 3. Deputy Hamilton, who was dressed in full uniform, verbally identified himself by announcing "Sheriff's office" twice in

succession while simultaneously pointing his gun at Campbell. Docs. 29-1 at 19; 29-2 at 14; 29-3 at 5; 29-4 at 3. Campbell did not verbally respond, but instead "turned and went back up the steps, stumbled a little," and made it through the gate onto the porch. Doc. 29-1 at 27–28, 31; 29-2 at 12–13.

To stop Campbell from fleeing, Deputy Hamilton followed Campbell. Doc. 29-1 at 52. As Deputy Hamilton ascended the steps, he saw Campbell bend over and pick up his rifle, and spin back around, pointing the rifle at Deputies Hamilton and Brown. *Id.* at 31, 33, 52–54; doc. 29-2 at 13, 28. Deputy Hamilton "saw the barrel come up and then fall," and "thought [Campbell] was going to shoot [him]." Doc. 29-1 at 31. Although Deputy Hamilton was close enough to Campbell that "[he] could have grabbed ahold of him," doc. 29-1 at 34, and was within three feet according to the medical examiner, doc. 29-5 at 12, Deputy Hamilton fired three shots in succession at Campbell, hitting Campbell's arm, torso and chest. Docs. 29-1 at 29–36; 29-2 at 24–25; 29-3 at 4–5; 29-4 at 4, 10; 29-20 at 2–7. Deputy Hamilton then ascended the porch to assist Campbell, as Campbell fell into a seated position in a nearby chair. Docs. 29-1 at 40; 29-3 at 6. According to Deputy Jones, Campbell stated "something to the effect [of], You startled me, or You scared me, or Surprised me, or something like that." Doc. 29-3 at 6. After the shooting, Beckman heard Deputy Hamilton say "Oh, shit." Doc. 29-6 at 17. Although Deputy Hamilton called for an ambulance, *see* docs. 29-1 at 41; 29-22 at

09.28.17.2p, Campbell died before the ambulance arrived, *see* docs. 29-2 at 31–32; 29-20.

### III. ANALYSIS

Beckman pleads one count of excessive force. Doc. 1 at 3. Specifically, Beckman contends that Deputy Hamilton, acting with malice or reckless indifference, violated Campbell's constitutional rights when he lethally shot Campbell three times in the arm and chest. *Id.* Deputy Hamilton seeks summary judgment on qualified immunity grounds.[3] Doc. 28 at 3, 17–25.

Relevant here, qualified immunity protects officials from suit, not just from litigation; that is, if the claims against them can be resolved at the summary judgment phase, the court must appropriately do so. *Pearson*, 555 U.S. at 231–32. To invoke qualified immunity, an officer "must first establish that he was acting within the scope of his discretionary authority." *Case*, 555 F.3d at 1325. Because Beckman does not contest this fact, *see generally* doc. 35, "[t]he burden shifts to [Beckman] to overcome the defense of qualified immunity." *Case*, 555 F.3d at

---

[3] "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see also Mercado v. City of Orlando*, 407 F.3d 1152, 1156 (11th Cir. 2005). "Qualified immunity allows government employees to carry out their discretionary duties without fear of litigation, 'protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law.'" *Mercado*, 407 F.3d at 1156 (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)). "'Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Case v. Eslinger*, 555 F.3d 1317, 1325 (11th Cir. 2009) (quoting *Pearson*, 555 U.S. at 231).

1325 (citing *Bates v. Harvey*, 518 F.3d 1233, 1239 (11th Cir. 2008)). To do so, Beckman must show that (1) Deputy Hamilton violated a constitutional right that was (2) clearly established at the time of the alleged violation. *Pearson*, 555 U.S. at 236; *Hope v. Pelzer*, 536 U.S. 730, 736–39 (2002). "[T]his two-pronged analysis may be done in whatever order is deemed most appropriate for the case." *Grider v. City of Auburn*, 618 F.3d 1240, 1254 (11th Cir. 2010).

The Fourth Amendment guarantees against "unreasonable searches and seizures," U.S. Const. amend. IV, and this guarantee "encompasses the plain right to be free from the use of excessive force in the course of an arrest," *Graham v. Connor*, 490 U.S. 386, 395–96 (1989). However, the right to make an arrest necessarily carries with it the right to use some degree of physical coercion or threat thereof. *Brown v. City of Huntsville*, 608 F.3d 724, 737 (11th Cir. 2010) (citations omitted). As a result, claims alleging that an officer used excessive force during the course of an arrest or other "seizure" are analyzed under an objective reasonableness standard. *Graham*, 420 U.S. at 388; *see also Hadley v. Gutierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008). That is, the officer's actions "must be judged from the perspective of a reasonable officer on the scene, rather than the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. "Reasonableness depends on all the circumstances relevant to an officer's decision to use force and the amount of force used." *Young v. Borders*, 850 F.3d 1274, 1279 (11th Cir. 2017).

Significantly, "it is reasonable, and therefore constitutionally permissible, for an officer to use deadly force when he has 'probable cause to believe that his own life is in peril.'" *Singletary*, 804 F.3d at 1181; *see also Young*, 850 F.3d at 1279 (citations omitted) ("An officer may use deadly force against only a person whom an officer reasonably perceives as posing an imminent threat of serious physical harm to the officer or others."); *Tennessee v. Garner*, 471 U.S. 1, 11–12 (1985) ("[I]f the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary . . . and if, where feasible, some warning has been given").

At issue here is Beckman's contention that Deputy Hamilton acted unreasonably when he used deadly force against Campbell. *See generally* doc. 35. More specifically, Beckman challenges Deputy Hamilton's testimony about the events that tragic night and argues that Deputy Hamilton lacked "probable cause to believe that his own life [was] in peril." *Singletary*, 804 F.3d at 1181; *see also* doc. 35. To support her contention, first, Beckman claims that Campbell was unable to "go down and back up" the porch steps "as claimed by Hamilton" because Campbell was "severely intoxicated" and had "a dislocated knee in a full leg brace that made walking of any kind, let alone going up and down stairs (perhaps even in a hurry)," painful and difficult. Doc. 35 at 7. In reviewing these contentions, and

11

Beckman's other contentions below, the court must construe the evidence and all reasonable inferences arising from it in the light most favorable to Beckman, the non-moving party. *See Adickes*, 398 U.S. at 157; *see also Anderson*, 477 U.S. at 255. However, the court is not required to resolve factual disputes in the non-movant's favor when "insufficient evidence supports the existence of the [alleged] facts." *See Pace*, 283 F.3d at 1276. Unfortunately for Beckman, the competent evidence does not support her version of the facts. *Id.* In particular, Beckman's own testimony belies her contention regarding Campbell's condition that evening. Specifically, Beckman testified that when she gave Campbell the replacement rifle just shortly before the officers arrived at their home, Campbell did not exhibit any signs of intoxication.[4] Doc. 29-6 at 12 (stating Campbell was not slurring his words or walking with an unsteady gait). Moreover, Beckman testified also that on the day of the fatal shooting, Campbell drove to and from work, worked a full day — albeit on desk duty due to his knee, and, after he came home, Campbell dropped off a weed eater and a tiller to a customer, and worked on that customer's central heat and air conditioning unit. Doc. 29-6 at 8.

Second, Beckman asserts that Deputy Hamilton failed to announce himself to Campbell prior to the shooting. *See* doc. 35 at 6 ("Beckman heard no announcement despite being in a position to hear one."). Again, Beckman's

---

[4] Campbell certainly had intoxicants in his system. *See supra* note 1. However, based on Beckman's testimony, it seems Campbell had a high tolerance for these substances.

testimony undermines this contention. According to Beckman, at the time of the shooting, Beckman was inside the trailer preparing dinner, *see* doc. 29-6 at 13–14. Moreover, Beckman testified that Campbell was playing his music "real loud" that evening and that the music made it difficult for her to make out the exchange between Campbell and the Whitakers. Doc. 29-6 at 16. In light of the loud music, which was still playing at the time of the shooting,[5] and Beckman's testimony that she was inside the trailer, her contention that she did not hear Deputy Hamilton identify himself is insufficient evidence to create an issue of fact on this issue. *See Pace*, 283 F.3d at 1276.

Finally, Beckman challenges Deputy Hamilton's contention that he shot Campbell in self-defense after Campbell pointed a gun at him. *See* doc. 35 at 11 (stating Deputy Hamilton shot an unarmed Campbell in the back). According to Beckman, the physical evidence, as explained by Beckman's expert David Balash, demonstrates that Campbell "was not facing Hamilton and was not presenting a gun toward Hamilton at the time Hamilton shot him" because the "first shot was into Campbell's left side, through the back of the left arm, at a roughly 90-degree angle to Campbell." *Id.* at 10–12. There are several flaws with Beckman's

---

[5] *See* docs. 29-1 at 19 (Deputy Hamilton describing music as "pretty loud"); 29-3 at 4 (Deputy Jones testifying that "[t]here is no discussion at the edge of the mobile home as we were waiting. We were waiting for a pause in the music so that he would be able to hear the announcement. And there was music playing from the vehicle very loud. And had music been playing, he would not have been able to hear. So we waited for a pause in the music before we came around the mobile home").

assertions. As an initial matter, even Balash admitted that he simply could not "say whether [Campbell] had a gun or whether he didn't have a gun or whether he was pointing it or not pointing it or whether he was using it as a crutch" because, as Balash explained, he has "no way of knowing that." Doc. 29-7 at 66. Moreover, the forensic evidence from the qualifying medical professional, Dr. Valerie Green, who performed the autopsy, supports Deputy Hamilton's contention that Campbell was facing him at the time he shot Campbell. *See* docs. 29-5 at 16; 29-20 at 3.

Again, although the court must resolve all reasonable inferences in the light most favorable to the non-movant, the court is however guided by the competent evidence. *See Pace*, 283 F.3d at 1276. Relevant here, a party cannot defeat summary judgment by relying on "unsupported speculation." *See Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005). Such evidence "does not meet a party's burden of produc[tion] . . . [and] does not create a *genuine* issue of fact . . . ." *Id.* (emphasis in original) (citations and quotations omitted). Indeed, in the context of a police shooting, the Eleventh Circuit has rejected similar contentions as Beckman's, holding that a witness's statement that she believed that the victim had his arms raised and was attempting to surrender was insufficient to defeat summary judgment. *See Pace*, 283 F.3d at 1279. As the Circuit put it, the witness's "conclusory opinion is inadequate to create an issue of fact about the objective danger . . . posed by [the victim] at the time of the shooting, much less

about the objective danger that a reasonable officer . . . would have perceived at the time of the shooting." *Id.* at 1281.

Ultimately, the court is tasked with judging Deputy Hamilton's actions "from the perspective of a reasonable officer on the scene, rather than the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. In doing so, because "it is reasonable, and therefore constitutionally permissible, for an officer to use deadly force when he has 'probable cause to believe that his own life is in peril,'" *see Singletary*, 804 F.3d at 1181, the analysis turns on whether Deputy Hamilton's belief that Campbell was reaching for his gun was objectively reasonable under the circumstances. Unfortunately for Beckman, viewing the facts from the perspective of a reasonable officer on the scene, *see Graham*, 490 U.S. at 396, the record supports Deputy Hamilton's contention that he acted reasonably in shooting Campbell under the circumstances that night. To recap, the dispatcher sent Deputy Hamilton and the other deputies to respond to reports of an active shooter. *See* docs. 29-4 at 7; 29-6 at 22; 29-8 at 4; 29-9 at 2–4; 29-10 at 2–5; 29-22 at 08.59.22.3p, 09.01.35.1p, 09.04.57.8p, 09.09.19.7p. When Deputy Hamilton arrived, he learned from the Whitakers that Campbell was intoxicated, had argued with the Whitakers, threatened to kill them, subsequently began shooting a rifle from 150 yards away at the Whitakers' property, and that one of the bullets had purportedly hit the Whitakers' house. Also, Deputy Hamilton heard Campbell

15

shouting, heard shots fired through the trees, saw individuals taking cover for protection, and, about halfway on his approach to Campbell's home, heard and saw Campbell shoot eight rapid-fire shots from his rifle. *See* docs. 29-1 at 2–5, 11–12, 23; 29-2 at 4–5; 29-4 at 3, 5, 7–8; 29-6 at 22; 29-8 at 4; 29-9 at 2–4; 29-10 at 2–5; 29-22 at 08.59.22.3p, 09.01.35.1p, 09.04.57.8p, 09.09.19.7p.

While Beckman contends that Deputy Hamilton unjustifiably surprised Campbell and failed to adequately announce himself or give Campbell any commands, *see* doc. 35 at 3–4, Deputy Hamilton made a plan of approach that accounted for the safety of himself and his fellow officers in light of Campbell's armed and intoxicated state, *see* doc. 29-1 at 17, 23.[6] Moreover, when Deputy Hamilton encountered Campbell, he announced himself at least once as "Sheriff's Office" and was dressed in uniform. *Id.* at 19, 27, 34; *see also* docs. 29-2 at 14; 29-

---

[6] When challenged regarding his method of approaching Campbell, Deputy Hamilton responded:

> I was dealing with an active shooter. I had information that he had threatened to kill [the Whitakers]. I had information that he was on his way back over there. I arrived. I heard the shots. They were hiding in fear. He is actively shooting the gun. It is an emergency situation that we have to deal with. Okay. I've got -- I've got information that he possibly shot the house. So, I'm dealing with a felony, reckless endangerment, officer safety. I had three other guys here. You know, we had to go. And to deal with that situation from that distance, and I've never had -- seen any enforcement training in the world where you identify yourself from a hundred yards away on an active shooter. That's the decision I made to go down that road and up the driveway and contact him when I was close enough to identify myself.

Doc. 29-1 at 17–18. Beckman argues that Deputy Hamilton's belief that Campbell had committed a felony, doc. 29-1 at 17 (reckless endangerment), is incorrect because reckless endangerment is a misdemeanor pursuant to Ala. Code § 13A-6-24. Doc. 35 at 5. However, this dispute is immaterial, because Deputy Hamilton had probable cause to use deadly force in light of his reasonable belief that Campbell was going to shoot him. *See Singletary*, 804 F.3d at 1181.

3 at 5; 29-4 at 3.[7] Before Deputy Hamilton had the opportunity to give any commands to Campbell, Campbell reached for his rifle and turned around pointing the weapon at Deputy Hamilton: "I saw the barrel come up and then fall, and that's when I shot. I thought he was going to shoot me." Doc. 29-1 at 31; *see also id.* at 33, 63–67. Indeed, one of the other deputies on the scene, Deputy Brown, also testified that Campbell "was coming up with the gun . . . [which was pointed] at Sergeant Hamilton and [Deputy Brown]." Doc. 29-2 at 12–13; *see also* doc. 34-7 at 2. In that moment, Deputy Hamilton had to make a split-second decision and, fearing for his life and that of his fellow officers, shot Campbell. *See* doc. 29-1 at 27, 31. Under the circumstances, and in light of the case law, Deputy Hamilton's use of deadly force was reasonable. *See, e.g.*, *Graham*, 490 U.S. at 396–97 ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation."); *Young*, 850 F.3d at 1279–80; *Carr v. Tatangelo*, 338 F.3d 1259, 1269–70 (11th Cir. 2003), *as amended* (Sept. 29, 2003) ("A reasonable but

---

[7] Other deputies also testified that the deputies announced their presence. *See* docs. 29-2 at 14 (Deputy Brown stating that he said "Sheriff's Department . . . three, four, maybe five times," but that "[he] couldn't tell you" if other deputies did, and that "[a]ll [he] know[s] is [he] definitely said Sheriff's Department"); 29-3 at 4 (Deputy Jones stating that he heard the announcement of "Sheriff's Department," but he cannot say if it was "the Sergeant or Tommie [Brown], but I know that the Sergeant probably did announce. It wouldn't make sense for Tommie to announce because he was coming from behind. So they both may have announced. I don't know. But I did hear announcement"); 29-4 at 3 (Deputy Aday stating he heard "'Sheriff's Department' or 'Sheriff' or something" just once).

mistaken belief that probable cause exists for using deadly force is not actionable under § 1983," because "[r]econsideration will nearly always reveal that something different could have been done if the officer knew the future before it occurred.") (internal quotations omitted). Accordingly, based on this record, this court finds no constitutional violation.

## IV. CONCLUSION

For the aforementioned reasons, Deputy Hamilton's motion for summary judgment, doc. 27, is due to be granted. The court will enter a final order contemporaneously herewith.

**DONE** the 28th day of April, 2017.

_____
**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE